EXHIBIT B

RECEIVED

SEP 1 2 2019

Lynn M. Krajacic
Town Clerk
Town of Evans

## REGULAR MEETING OF THE
## TOWN OF EVANS PLANNING BOARD
## WEDNESDAY, JULY 10, 2019

**MEMBERS PRESENT:**    A. Sellers, J. Pinter, J. McEvoy, B. Bergum, M. Connors, Andrew Lloyd
**ALSO PRESENT:**    William Smith, Director of Planning & Community Development
    Jeneen Hill, Code Enforcement Officer

Chair A. Sellers opened the meeting at 7:00 P.M. The meeting took place in the Court Room of the Evans Municipal Center, 8787 Erie Road, Angola, NY 14006.

**Chairwoman Sellers:** I would like to welcome everyone to the July 10, 2019 Planning Board meeting.

Apologies were given for having to cancel the June 26th meeting due to the inability to secure a quorum.

Before we begin tonight's meeting we have some housekeeping we need to take care of; regarding minutes from the January 23rd and February 27th, 2019 public meetings; are there any additions, corrections or questions or may I please have a motion to accept them as submitted.

**J. McEvoy:** Motion to accept.
**J. Pinter:** Second.

*Vote: All in favor; motion carried.*

For the record, a Planning Board Public Meeting is conducted solely for the pre-determined action items listed on the official Planning Board Agenda as advertised. No other unrelated items may be brought before the Planning Board at a Public Meeting. That being said, if any resident wishes to comment for or against an action item listed on the Agenda, it is their right to do so when the floor is opened to the public. Each person is limited to one opportunity to speak and comments shall be limited to 3-minutes. If you wish to comment, and haven't done so already, we ask that you sign up on the sheet located on the table in front of us.

### 1. First item on the agenda is:

**Site/Parking Plan Review – Suncliff on the Lake** – expansion of surface parking lot and construction of secondary driveway at 6892 Lake Shore Rd., Derby, NY 14047, SBL# 206.00-1-10. Petitioners: Brenda Shaw and Dr. David Johnson, 6892 Lake Shore Rd., Derby, NY 14047.

**HISTORY:** There is a bit of history on the property...

- The property once housed the St. Columban Retreat Center and was purchased by the Johnson and Shaw families on November 1, 2017 from the Catholic Diocese of Buffalo. The new owners have since opened a Lakeside Boutique Mansion hosting banquets, weddings, retreats, conferences, corporate events, garden parties, workshops, etc. The Mansion houses a bar/restaurant and offers overnight accommodations with 17 guest rooms in the Mansion as well as 58 one person single bedrooms in the Annex building.

- In early May 2019, the Town requested that a site plan application for expanded parking lot, vehicle egress and fire lane (including landscaping, drainage, lighting, and signage) be submitted to address some immediate parking, access and safety concerns.

- On May 17, 2019, an application was submitted with a complete site plan package to the Planning Department, a later version was filed on June 11, 2019 based on initial review.
- On June 12, 2019, the project was reviewed at the Planning Board Work Session.
- And on June 25, 2019, revisions were submitted based on feedback provided by the Planning Board during Work Session.

## INTERDEPARTMENTAL REVIEWS:

- **Planning Director, William Smith:** I have no comment or objections at this time. I spoke to the owners about the need to remove some brush and a couple trees from the exit on Lake Shore Road to improve the line of sight at the new exit on Lake Shore Road, other than that there are no objections as the plan has been revised to meet the minimum parking requirements put forth in Section 200-27 of the Town Code; proper vehicle egress and access for emergency vehicles has been addressed through the creation of a secondary driveway; and all the Planning Board's comments have been addressed from Work Session. In addition, the overall landscaping plan is consistent with the design standards put forth in Section 200-20.1 for a Waterfront Mixed Use District in the Town of Evans.

### Chair:

- **Town Engineer, Dave Johnson of CPL:** As requested, the applicant provided an updated Stormwater Pollution Prevention Plan (SWPPP) to include any parking spaces and impermeable pavement added to the new site plan. The updated SWPPP has since been approved by the Town Engineer.
- **Chair - Code Enforcement Officer, Jeneen Hill:** While there are no objections to the site plan approval, a question was raised regarding the condition of the on-site fire hydrant at the Fire Chief Council meeting. Any necessary repairs to keep the hydrant in good working order should be performed immediately by the owners or it should be covered or removed.

## OUTSIDE AGENCY REVIEWS:

- **Erie County Department of Environment and Planning:** The 239M Review was sent to the County on May 24, 2019 and returned on June 20, 2019; they offered no recommendation having determined the proposed action to be of local concern.

**SEQR:** The Planning Board has reviewed the short form of the SEQR and has found no significant environmental concerns.

Are there any questions or comments from the Board before I open the floor to the Applicant. (*No questions or comments provided.*)

There being no further questions or comments from the Board, at this time I will open the floor to the Applicant and/or his representative – please step up to the microphone, state your name and address, spelling your last name for the record. PLEASE REMEMBER, comments shall be held to the 3-minute time limit per person, and each person shall be limited to one time at the microphone to comment.

**Kevin Connors, Architect, EcoLogic Studio:** This project was initiated by the Town after the change of ownership and looking more closely at the parking needs of the facility as it was being used after the Diocese sold the property. This is the second generation of the plans as there was a little grey area about the number of parking spots that were required, but that got resolved within the last several weeks. We have made all the corrections and additions to the plans that were requested at the Work Session with the Planning Board.
**Chair:** Is there anyone else who wishes to speak on this project?

*No response.*

**Chair:** There being no further comments, I will close the floor and bring it back to the Planning Board for further questions/comments. Are there any further questions or comments from the Planning Board? (*No questions or comments provided*) There being no further questions from the Planning Board may I please have two motions – one regarding SEQRA and one regarding Site/Parking Plan Approval.

**J. McEvoy:** I will make the SEQR motion. Based on the Town's review of the information submitted and the guidelines of the New York State Environmental Quality Review Act, the Planning Board has determined that the project is not anticipated to result in any significant effects on the environment and that a negative declaration is hereby issued.

**J. Pinter:** Second.

***Vote:*** *All in favor. Motion carried.*

**Chair:** Having made this determination, I will need someone else to provide the next motion please.

**M. Connors:** I will do the next motion. Having made this determination, I would also like to move to approve the project based on the following reason(s):

1. The project appears to be consistent with the Town of Evans Comprehensive Plan.
2. The action will enable the applicant to provide improved services to their clientele, thereby benefiting the community and region.
3. The proposed action is consistent with the polices and standards of the Town of Evans Local Waterfront Revitalization Program as well as Waterfront Mixed Use District per Section 200-20.1 of the Town Code.

and with the following condition:

1. Compliance with the Town of Evans Code Enforcement and Planning Department review and comments.

**B. Bergum:** Second.

***Vote:*** *All in favor. Motion carried.*

**Chair:** The Planning Office will send a letter on behalf of the Planning Board to the Code Enforcement Office advising of our action tonight. Please continue to work closely with the Planning and Code Enforcement Offices as you move forward with this project. Please thank Dr. Johnson and Ms. Shaw and their families for investing in our community and we wish them luck.

## 2. The Second item on the Agenda this evening is a:

**Site Plan Review – Derby Warehousing, LLC** – for the proposed demolition of an existing 2,800 sq. ft. metal building and construction of a 27,500 sq. ft. warehouse at 1393 Wisconsin Rd., Derby, NY 14047, SBL# 206.00-4-9.1. Petitioner: Derby Warehousing, LLC, PO Box 773, Derby, NY 14047.

**HISTORY:** There is a bit of history on the property...

- The property was previously owned by Wilbur & Doris Smith and the warehouse housed Lads Pet Supplies and was used for the storage and distribution of animal supplies. In April of 2002 the property was purchased by the Fierle's and the warehouse currently houses outdoor power equipment.
- In early May 2019, the owner of Derby Warehousing, LLC. presented a preliminary concept Site Plan to the Planning Department for the demolition of an existing 2,800 sf metal building and the construction of a 27,500 sf warehouse for the storage and distribution of outdoor power equipment.

- On June 7, 2019, an application was submitted with a complete site plan package to the Planning Department for review.
- On June 12, 2019, a side yard setback variance was requested and approved by the Zoning Board of Appeals, reducing the minimum 50 ft setback to 15 ft.
- Also on June 12, 2019, the project was reviewed at the Planning Board Work Session.

## INTERDEPARTMENTAL REVIEWS:

- **Planning Director, William Smith:** I have no objections for the reason that the parcel is zoned for Light Industrial use and the required setback variance has been approved by the Zoning Board of Appeals. However, I would like to enter into the record the letters received by the Planning Department from Wisconsin Road residents regarding their concerns around truck traffic. These concerns were duly noted and have also been shared with the Highway Superintendent and Chief of Police for their comment, which Anne will read their responses.

### Chair:

- **Town Engineer, Dave Johnson of CPL:** No comments, as the drainage plan shows no new negative impacts.
- **Code Enforcement Officer, Jeneen Hill:** Per comments made at the Fire Chief Council meeting, the parking area identified at the rear of the property must be large enough to allow for firetrucks to turnaround.
- **Highway Superintendent, Ed Michalski:** If there is minimal truck traffic increase, this should not disturb the integrity of Wisconsin Road which has already been established as a truck route. However, the turning radius for egress and ingress at the approach from Wisconsin Road should be addressed to avoid any trucks from encroaching on neighboring properties.
- **Chief of Police, Douglas Czora:** Supervisor Hosler requested in early June 2019 that the police department run radar on Wisconsin Road, several radar details have taken place and several traffic stops were conducted.

  Since January 1, 2019, the police department has received one complaint of a speeding concrete truck where a patrol car was dispatched. The responding officer was unable to locate said vehicle. We also believe it was not related to the project.

  Also since January 1, 2019, all the vehicles stopped on Wisconsin Road were passenger cars. None were tractor trailers.

  Typically, when a business exists in any neighborhood and complaints are brought to their attention, the business will take steps to address the issue in order to be good neighbors. A speed of 30 mph in any residential neighborhood is fast. The vehicles appear to be traveling fast even when traveling at the speed limit. We will include Wisconsin Road when considering where to place our electronic speed limit sign so vehicle operators can monitor their own speed, and homeowners can see how fast they are actually traveling. We will also continue to have patrols do speed enforcement checks.

## OUTSIDE AGENCY REVIEWS:

- ○ **Erie County Department of Environment and Planning:** The 239M Review was sent to the County on May 24, 2019 and returned on June 17, 2019; they offered no recommendation having determined the proposed action to be of local concern.

**SEQR:** The Planning Board has reviewed the short form of the SEQR and has found no significant environmental concerns.

Are there any questions or comments from the Board before I open the floor to the Applicants?

**Chair:** I have a comment. I have been down the road frequently and we've all noted how carefully the residents have worked to make people aware of that 30mph speed limit with all of your signs, even one in front of the business. It is a difficult road because you have no shoulders; I bike on it. I live on Old Lake Shore Road and I'm saying it's the same as all these other roads, but it's only like Old Lake Shore Road if you're down in front of the old St. Vincent DePaul Camp, where there are no shoulders; there is no place to go but the ditch. So, we realize that's a problem for you. I've been visiting with neighbors and friends who live on that road and watching cars that to me appear to be going more than 30mph. I'm told that the police are putting out those monitors today, so by tomorrow you should be noticing them so you can see for yourself what people are actually doing on your road. It certainly does appear when you're on the road, especially on a bike, that some people are doing more than 30. But it is so narrow that you are very sensitive to it when you're biking on that road.

Are there any further questions or comments from the Board before I open the floor to the Applicant?

### No questions or comments provided.

There being no further questions or comments from the Board, at this time I will open the floor to the Applicant and/or his representative – please step up to the microphone, state your name and address, spelling your last name for the record. Again, PLEASE REMEMBER, comments shall be held to the 3 minute time limit per person, and each person shall be limited to one time at the microphone to comment.

**Andrew Marino, Tredo Engineers, 755 Seneca St., Buffalo, NY:** Good evening. I am representing the Derby Warehousing and their tenant KPM, which is a tractor, snow blower, equipment supplier; they have loading docks and so forth for truck egress, as we know. It is spot zoned for the use and the proposal is for a 27,000 sq. ft., one-story warehouse. There are some improvements to the fire lane to get to the back by widening the driveway and creating a truck turnaround in response to the Highway Department, the apron has been widened, there was a tree removed and the apron itself is actually about 72-feet wide as measured, and should be sufficient for any semi-truck egressing that parcel. The fact is I was on that road as well and it is very narrow so I can understand how prior to the widening of this apron that the truck would have had difficulty getting out. There is no doubt that they have to pull into the opposing lane in order for that to happen, as this is an extremely narrow, roughly 21-feet wide, of paved roadway without a shoulder. In witnessing the local conditions just now though, it was very quiet, so unfortunately I was unable to witness any other vehicles, particularly any trucks. I would like to see myself if the trucks can make it in and out of there now, reportedly they are in much better shape than they were before. I am here with the owner of the company and the developer if there are any questions in regards to operations or the construction of the facility.

**Chair:** Rather there be back and forth, it might be better for Mr. Fierle to take the microphone right now and explain a few things about the hours of operation, when trucks would be coming, how a warehouse can be that much bigger than the one you're taking down and not have some change in truck traffic. So, I'm thinking that is preferable to having people go back and forth with questions.

**Jeff Fierle, 1393 Wisconsin Road, Derby:** Thank you. I started the business back in 1994 and I moved to Wisconsin Road from the city of Buffalo and purchased the building from Wilbur Smith in 2002. I put approximately $175,000 into the building the first year and remodeled it, resided it, rerooded it, and have been pretty much trying to keep the integrity of the neighborhood. I will say that I am quite proud that we have done that. The building is very difficult to see from the road and I am very happy about that. I go out of my way, we have lilac bushes along the driveway, and we have pine trees and different trees across the front. The reason why the driveway egress was kept to a minimum was because I wanted to keep that look of not being able to see it; I could make the driveway 100-feet

Page 5 of 22

wide, and you're going to drive by and you're going to see it. We have increased the width of the driveway now. I sold Fierle Distribution in 2008; I sold it to a company by the name KPM, who are out of Landing, New Jersey. KPM is very similar to what I do; we do not sell retail, we sell strictly wholesale. We sale commercial power lawn and garden equipment to dealers that sell it to the contractors that come and cut your grass (very large equipment). KPM bought Fierle Distribution, I stayed on with KPM. Three years ago we constructed a brand new 100,000 square-foot facility; it is a state-of-the-art facility. KPM is extremely fussy about what their properties look like. Unfortunately, or fortunately, we have outgrown that facility. That facility has room for expansion but because of environmental situations, it would take several years to get a permit to put a building up. KPM came to me and my wife and asked what were the possibilities of expanding Derby. KPM operates out of this facility Monday thru Friday 8am to 5pm, there are no weekend hours. It is extremely quiet in there. I did a research survey over the past 6 weeks for the rezoning and we are averaging 2.7 trucks per day. Somedays we get one, somedays we get none, somedays unfortunately we get 3 to 5. But I will say there is no overnight parking, there is no truck allowed on premises before 8am. Occasionally somebody will sneak in there around 7:30-7:45, but everything is shutdown and done by 5pm at night. Now when there is a snowstorm or something like that, occasionally the trucks get in there a little late, 5:30/5:45pm. Regarding the truck traffic, someone questioned me, "how can you put up a new and larger facility and have the same amount of truck traffic." I'd like to explain a little bit about what's going on in the trucking industry. The trucking industry in the last five years has been a disaster. With the new regulations imposed on trucking and the hours that a trucker can actually drive, it took 38 percent of the trucks off the road in a 24-hour period. Currently a driver can only drive for 8-hours, he has to take a 2-hour break and then he can only drive for another 4-hours; long story short, the trucking industry right now is a mess. What is happening is we cover a territory from Maine to Virginia and right now we have limited inventory; there are 37 different models of Scag lawnmowers. When someone calls up and orders 4 mowers, 2 of them come out of New Jersey, two of them come out of Derby.

**Chair:** Mr. Fierle, I'm going to interrupt you to be brief and try to address the issue of how you can expand and not have considerably more truck traffic.

**Mr. Fierle:** I'm sorry. That is where I'm at right now. An LTL carrier (less than load), two lawn mowers have to go less than load, and if they go to Maine and another two go to Virginia, that's two different trucking companies, because LTL's only have specific routes. Where I can call, used to be New England but they just went out of business, right now Estes is coming into Western New York pretty heavily, I can go to Estes with all my orders and they will take that full-load, not an LTL load, and dispatch it within their hub. I would never make a guarantee that there is going to be less truck traffic, as I have no way of knowing that; not today, not next week, not a year from now. I anticipate no change with KPM. If KPM leaves, I do not know who might come in. Someone may come in and run 7-days a week, they may be coming in with 6 trucks; we need KPM to stay. KPM is agreeing if I can get this facility, they will sign a 10-year lease. I'm sorry for the length; I get carried away.

**Chair:** Thank you. I think we will open the floor to the public and if we need you to take the microphone again at the end to address any issues, we will call you back up. If there is anyone from the public who would like to comment, please step-up to the microphone, state your name, address, and spell your last name for the records.

### Tom Tyler, 1436 Wisconsin Road, Derby:

- o  Concerns with the number of trucks on Wisconsin.
- o  Questioning Mr. Fierle's request for $57,000 in tax breaks through ECIDA; only 1.5 jobs created.
- o  Suggested an alternate location that is for sale in the Town for Mr. Fierle to purchase versus expanding on Wisconsin.

**Chair:** Now I have to tell you that I am sure this is the report from the Erie County Industrial Development Agency, so he makes his case there. That agency will determine what the payment in lieu of taxes (PILOT) is to the Town. While it's true that 1.5 jobs or 2 jobs as we had previously discussed,

these are only things that we read in the paper; it may not be a lot, though it may be a lot for the man that lost his job at the hat factory. So, I don't think we are against business prospering. Thank you Mr. Tyler.

**Marguerite Vail, 7306 Derby Road, Derby:**
- ○ Concerns about the size of the building increasing thus adding to truck traffic.
- ○ Building should not be expanded due to a rural setting.

**Linda Affronte, 1380 Wisconsin Road, Derby:**
- ○ Three or four trucks going up Wisconsin Road is eight trucks going past her house in an 8 hour period; that is not acceptable.
- ○ Concerns with both a truck and another vehicle sharing road; there is no room for walkers.

**Chair:** Is there anyone else who wishes to speak? Being no further comments, lets close the floor to the public. I think our Board may have some comments based on what they have heard.

**J. Pinter:** We have no way to regulate truck traffic in the future.

**Chair:** I don't believe so. Ed Michalski stated in his report that the road is established as a truck route and it is built to hold those trucks; Derby Road is not.

**A. Lloyd:** Are there any weight restraints on Wisconsin Road at this time?

**Chair:** Wisconsin Road, no. Derby Road does have them. Mr. Fierle has stated that he would be happy to have trucks come from Routes 20 or 5; they could come off the Thruway at Eden Evans Center and you could bring them up 5 or 20, but we never like to choose one side over the other as it puts all that traffic in one way. Actually, with the weight restrictions on Derby Road, coming up Route 5 to Wisconsin, is the way he probably going to have to keep it. Is that the way your trucks come now? **Mr. Fierle:** I would say about 65-70% come Route 5. The same truck that comes into L. A. Hazard many times is making a second stop.

**Chair:** Well, they no longer have a problem with the Overhead Bridge since it has been rebuilt, but Derby Road does have weight restrictions on it. I don't see any way to improve the width of Wisconsin Road at the time being. I guess if we are thinking of approving this, we are going to be trusting Mr. Fierle that there will not be considerably more truck traffic. Instead the trailers will be more apt to be full than the partial loads they are now carrying. The Town will receive additional tax money because the PILOT, payment in lieu of taxes, will be set by the Erie County Industrial Development Agency, if he gets it. Have you received word on that yet?

**Mr. Fierle:** *Nodded 'no.'*

**Chair:** It's an existing business, it's an existing site, it's zoned correctly, he had no problem with the Zoning Board of Appeals' meeting with the neighbor on reducing the setback. Do we have any further comments or should we move for a resolution and see how the vote goes?

**B. Bergum:** I'd like to make a comment. I understand about the traffic and that it's a small road with truck coming down. The problem is, if we keep restricting everything we are not going to have business and your taxes are going to keep increasing. Somewhere there is a give and take, I don't know what it is, but you said possibly on Delamater Road, but then you're just pushing it over to Delamater and you're making it their problem; you know what I'm saying. Is it a problem or isn't it a problem? Maybe he's making a state-of-the-art building and the place on Delamater isn't what he needs. I don't know, I'm not an engineer, but if we keep restricting...I know we want to be rural, but the first thing everybody says is taxes, taxes, taxes, taxes. The Town of Evans is one of the highest and if we keep restricting everything, we are going to have high taxes one way or the other.

**Chair:** I actually have less problems restricting things if it's going to make a difference with safety in a neighborhood. I think Mr. Fierle has a huge burden to let this neighborhood say. He has the zoning and the right to do a business where he is doing it. We wish every business in Town to be prosperous. I wish there were some way that we could restrict and say this is the number of trucks you will be limited to, but we don't have that ability. So the burden is on Mr. Fierle; we cannot give him a temporary use permit to expand. Once he builds that building and sinking all this money into it, it is a

business investment. Derby Road should be an enforcement issue; the Evans Police should be notified if you see commercial traffic that is exceeding the weight limits on that road. The Chief thinks that Wisconsin Road is no different than a lot of our small rural roads that people tend to speed on them. The FedEx truck looked like it was speeding on it when I was on it. It's generally a quiet road; I've been taking it literally on weekdays so that I would be maybe finding a truck, it's so hit and miss. I haven't found any of those tractor-trailers, but I don't live there, so I'm not seeing what you see living there. So I think if we have no further comments we should ask for a motion. But Mr. Fierle you know what this neighborhood is, you have a huge burden here to keep this rural, quiet residential road safe. May I have a motion please.

**B. Bergum:** SEQR Motion - Based on the Town's review of the information submitted and the guidelines of the New York State Environmental Quality Review Act, the Planning Board has determined that the project is not anticipated to result in any significant effects on the environment and that a negative declaration is hereby issued.

**J. McEvoy:** Second.

*Vote: All in favor. Motion carried.*

**J. Pinter:** I would also like to make an approval motion. Having made this determination, I would also like to move to approve the project based on the following reason(s):

1. The project appears to be consistent with the current zoning of the property.
2. The action is not expected to result in any significant adverse impacts.
3. The project will not result in any changes to the character of the surrounding community.

and with the following condition(s):

1. Compliance with the Town of Evans Code Enforcement, Planning, Highway and Police Departments' review and comments.

**B. Bergum:** Second.

*Vote: All in favor. Motion carried.*

**Chair:** The Planning Office will send a letter on behalf of the Planning Board to the Code Enforcement Office advising of our action tonight. Please continue to work closely with the Code Enforcement Office as you continue through the building process which is under their jurisdiction. The Planning Office will continue to assist you if needed. Thank you for continuing to invest in the Town of Evans. Good luck and best wishes to you as you continue with the construction process.

**Mr. Marino:** Thank you very much.

### 3. The Third item on the Agenda this evening is a:

**Rezone – Alliance Homes/Schunk Enterprises, LLC** – for a proposed rezone from General Business (GB) to Multi-family (MFR-4) of a 5.14± acre vacant parcel for the purpose of building 4 single-story townhouse buildings and 2 two-story apartment buildings located on Erie Road near the corner of Minuteman Trail, Derby, NY 14047, SBL# 206.07-1-26.1. Petitioners: Alliance Homes/Schunk Enterprises, LLC, 4727 Camp Rd., Hamburg, NY 14075.

**HISTORY:** There is a bit of history on the property...

- The vacant parcel was originally owned by the Pious Society of St. Paul and was purchased by Schunk Enterprises, LLC in February of 2017.
- On May 8, 2019, Alliance Homes and Schunk Enterprises, LLC. filed an application with the Planning Department for the Rezone of 5.2 acres on Erie Road in Derby from General Business (GB) to Multi-Family Residential-4 (MFR-4).

G:\PLANNING\PLANNING BOARD\Minutes\2019\Approved\100828 Suntliff, KPH, Alliance, Zoning Amends.docx

- The concept plan calls for 40 market-rate housing units geared towards seniors and young professionals, ranging in size from 850 to 1,100 sf, including off-street parking and two 5-car garages.

- On May 15, 2019, the proposed Rezone and concept Site Plan was reviewed at the Planning Board Work Session.

- On June 20, 2019, the applicants presented the concept plan to neighboring property owners at the Highland Hose Fire Hall.

- As a side note, the property owner has also requested that the parcel be zoned back to General Business if the future Site Plan application is not approved.

## INTERDEPARTMENTAL REVIEWS:

- **Planning Director, William Smith:** I currently have no objections as the parcel for the proposed rezone is currently abutting both Residential Two Family (R-2) and Multi-Family Residential 4 (MFR-4) districts and therefore would not be considered as spot zoning. In addition, the proposed project addresses the need directly called out in the Town's Comprehensive Plan, which is market rate housing for seniors and supporting the creation of a more walkable environment, in our commercial corridors. I would have no objections based on our Comprehensive Plan.

**Chair:**

- **Town Engineer, Dave Johnson of CPL** offers no comments.

- **Code Enforcement Officer, Jeneen Hill:** No comment

## OUTSIDE AGENCY REVIEWS:

- o **Erie County Department of Environment and Planning:** The 239M Review was sent to the County on May 24, 2019 and returned on June 17, 2019; they offered no recommendation having determined the proposed action to be of local concern. However, the following comments were made:

  - o Division of Sewer Management (DSM) – The existing public sewer will need to be extended to service the parcel and a sanitary sewer downstream capacity analysis will be required. The design engineer is encouraged to discuss preliminary sanitary sewer plans with DSM.

  - o Department of Health (ECDH) – ECDH has a moratorium on water line extensions in the Town of Evans due to inadequate water for fighting fires and maintaining minimal pressures during high demands. This applies to residential and commercial service connections.

    - ▪ Note: The ongoing water tower project will effectively lift the moratorium well before the start of construction on this proposed project (within a few weeks when design drawings for the new water tower are submitted).

Are there any questions or comments from the Board before I open the floor to the Applicants? With no further comments from the Board would the applicant's representative step-up to the microphone, state your name, spelling your last name, and address.

**Andrew Romanowski, Alliance Homes:** Good evening, Bill Buerk is with me here tonight, however, our partner Wesley Schunk, who is the property owner was not able to attend this evening as he is out-of-town. I think this project is pretty familiar to most of the people in the room. As previously

mentioned we appeared before the Board in May and again at a meeting that we held in which we were able to present this to the neighbors, so I recognize most of the faces here. I think you summarized a lot of what we intend to do in your opening comments. We are looking for the rezone from General Business to Multi-Family 4 for the purpose of building 40 upscale market-rate apartments. The mix is to build four single-story townhouse style units which have an attached garage and sixteen two-story more traditional apartment buildings with plenty of parking on the side with proposed 68 parking spaces including 34 garage spaces. It's interesting to note one of our most important target markets here is the senior community. We are hoping to provide housing for people that wish to stay inside the community, maybe downsize or move-in to a more maintenance free situation from their existing homes; that demographic has the lowest traffic count so we think that our traffic impacts will be minimal and parking will be more than adequate for the facility.

**Chair:** Thank you very much Mr. Ronanowski. I would like to open the floor to the public, but I would like the public to understand what we are doing here tonight. We do have his plan in front of us, but we are not addressing the plan, we are addressing the concept for rezoning. We know what his plan looks like, but we are going to take comments and then pass it on to the Town Board; a recommendation for rezoning or a recommendation against rezoning. After which, the Town Board will hold a public hearing and they will make the final determination whether he gets rezoned. Many of you were at that fire hall meeting and saw that plan so I'm asking you to come to the microphone, state your name and address and spell your last name for the record. Any comments you have will go to the Town Board. You are welcome to go to the Public Hearing. You can come again to the Planning Board if the rezone passes at the Town Board level, that is when we will be addressing the site plan. So that is the time to come if you need some adjustment to the plan, something is going to protect your property more and that's what you would like, you need to come to our site plan meeting. The date of that meeting will be publicized.

### Christine Majewski, 6886 Chaffee Court, Derby:
  - o Most affected property owner, affecting both her backyard and side yard.
  - o Twenty-five feet egress of space concerns her.
  - o She has no preference if it's Residential or General Business, she just wants to make sure the surrounding property owners are taken care of.
  - o Requesting a huge fence, berms with trees, etc. because they are in her backyard.

**J. Pinter:** Just to be sure I understand you clearly; you are not against the rezone, you just want make sure that your needs are met whether it is GB or MFR-4, correct?
**C. Majewski:** Correct.
**B. Bergum:** Maybe use some plantings or something.
**Chair:** No, it's more than that actually because the property line is tight and when I've been up there and walking it the other apartments that come back, there they are very visible. I think there could be much better screening even though it's tight, there could be planted screening that might be bigger and better than a fence. Is there anyone else? Even if you just agree with Ms. Majewski, if you'd like to come up and just have your name put on the record and you don't need to restate everything.

### Nicole Alfieri, 6883 Chafee Court, Derby:
  - o She agrees with Ms. Majewski concerning what happens in her backyard.
  - o Doesn't want a fence, wants trees.
  - o Doesn't like the cut-through.
  - o Major water issues; that property is a huge water issue; all their water comes into my yard.

### Richard Graf, 6874 Chaffee Court, Derby:
  - o Traffic concerns on the state highway; would like to see a signal light installed.
  - o Water problem now due to subsurface water; once built-up, less ground area to absorb water.

**Chair:** Is there anyone else who wishes to speak? *(no response)* There being no further questions or comments from the public, I will close the floor to the public. Bill, I would like you to speak about the requirements for drainage on this project and why if he's owned it for a few years the drainage hasn't improved. When the land is unapproved and the owner owns it, why the drainage doesn't change and what the changes would have to be with this project.

**B. Smith, Planning Director:** They entire Town is an MS4 District, so that means any new development would require a Storm Water Pollution Prevention Plan (SWPPP) and for the implementation of that plan. Some of the drainage issues you're seeing today, this is just a concept plan, but when they go through a full Site Plan application and review, that will require a full drainage study, a full drainage plan. The policy would be that any stormwater on that site needs to kept onsite. With a development like this, there should be an improvement with any drainage issues that are being caused by the current site. Water that's running off this property today, into your yards, with this project, that can't happen.

**Chair:** Thank you. We cannot tell you that other unimproved lands that are attached to that are going to change. If you are getting water off of those properties that will continue, but this property, once approved, will not be allowed to have any water leave the site.

**A. Lloyd:** That would be surface water. If it is a subsurface water issue they are required to collect run-off water from a rain event, not necessarily a subsurface water.

**Chair:** There being no further comments, I will close the floor and ask for a motion. This motion will be to send it to the Town Board for a public hearing.

**J. McEvoy:** I would like to make a motion to recommend approval of this rezoning to the Town Board based on the following reasons:
1. The action is consistent with the Town of Evans Comprehensive Plan.
2. The project will constitute the use of an underutilized property and provide the opportunity for market-rate housing in the Town.
3. This development will provide an additional alternative source of housing for the senior population
4. The action is not expected to result in any significant adverse impacts.

I would also like to recommend that the following conditions be placed on the approval of this action:
1. Any future development of this parcel to be rezoned is subject to a full site plan application submittal, review and approval by the Planning Board.
2. Any landscaping, drainage, parking, lighting, setbacks, building heights, and any other design elements shall follow the requirements of Evans Town Code.
3. If the applicant determines during the site plan approval process that the project is no longer feasible, the parcel will be returned to a General Business zoning district.

**B. Bergum:** Second.

*Vote: All in favor. Motion carried.*

**Chair:** The Planning Office will send a letter to the Town Board notifying them of our recommendation for the rezoning of the property located on Erie Road near the corner of Minuteman Trail, SBL# 206.07-1-26.1. Good luck to you as you as you continue through the Rezone process.

### 4. The Fourth item on the Agenda this evening is a:

**Zoning Amendment** – to recommend for approval to the Evans Town Board additions and/or amendments to the following Sections of Town Code: Section 200-21B(1) General Business District; Section 200-8.1 Agricultural and Open Space District and Section 200-17(L) Zoning to add Town of Evans Solar Energy Systems Law.

**The First Zoning Amendment for consideration is:**

## PROPOSED LAW NO. 4 OF 2019 – SOLAR ENERGY SYSTEMS LAW

The proposed law will add Article XIII. Solar Energy Systems Law to Section §200: Zoning of the Town of Evans Code, outlining standards and regulations for the location, design, installation and operation of Solar Energy Systems within the Town.

As stated in the Comprehensive Plan adopted January 9, 2019, the Town of Evans recognizes that solar energy is a clean, readily available source of renewable energy and intends to accommodate the use of Solar Energy Systems in the Town in a responsible manner. Understanding that there is growing need to properly site Solar Energy Systems within the boundaries of the Town, this law is designed to protect land uses in the community and protect the health, safety and general welfare of citizens; preserve the overall beauty, nature and character of the Town; and promote effective and efficient use of solar energy resources. Prior to the adoption of this law, the Town had no specific procedures to address the use and citing of Solar Energy Systems.

In recent months, the Planning Department has worked closely with the Town's various boards and advisory committees to develop a final draft of the Solar Energy Law, including the Climate Smart, Agricultural, and Conservation Committees.

Drafts of the Solar Energy Law were also reviewed at Planning Board Work Sessions held on May 15th and subsequently on June 12th of 2019, as well as at Town Board Work Sessions held on May 1st and subsequently on June 19th of 2019.

### INTERDEPARTMENTAL REVIEWS:

- **Planning Director, William Smith:** No further comments; however, I would like to enter into the record three letters of support for the current draft of the Solar ordinance provided by the Agricultural, Conservation and Climate Smart Committees.

**Chair:**

- **Town Engineer, Dave Johnson of CPL:** No further comment
- **Code Enforcement Officer, Jeneen Hill:** No further comment

### OUTSIDE AGENCY REVIEWS:

- **Erie County Department of Environment and Planning:** The 239M Review was sent to the County on June 21, 2019 and returned on July 1, 2019; they offered no recommendation having determined the proposed action to be of local concern. However, the following comments for consideration were provided by the Erie County Department of Environment and Planning:
  - The Town may wish to amend its zoning map, possibly by way of an overlay or floating zone, to further preclude the corridors of Routs 5, Lake Shore Rd, and Eden-Evans Center Rd. between Routes 5 & 20 from utility scale Solar Energy
  - systems (Type 1 SPS).
  - The Town may wish to add language prohibiting the removal of prime soils from any parcel on which a Type 1 SPS is proposed.
  - The Town may wish to add language addressing solar on historic structures.

Are there any questions or comments from the Board before I open the floor to the Public?

*No questions or comments provided.*

There being no further questions or comments from the Board, at this time I will open the floor to the Applicant and/or his representative – please step up to the microphone, state your name and address, spelling your last name for the record. PLEASE REMEMBER, comments shall be held to the 3-minute time limit per person, and each person shall be limited to one time at the microphone to comment.

**William Henry, 1456 Pontiac Road, Angola:** I actually have the first solar powered house in the Town of Evans, as well as it is the fourth in all of Erie County; it was installed in 2007. Our taxes are very high and one way for us to alleviate those high taxes is to reduce our utility costs in order to stay here. My electric bill was $18 per month, that's helping considerably.
*Mr. Henry submitted letters to the Planning Board.*

As many of you know, I have been active in trying to support solar. I have worked with the Erie County Legislature in which we removed the sales tax on solar on both commercial and residential systems and we were one of the first counties in the state to do so.

First off in 2005 I took a solar installer course in order to help my community; at the time I lived in the Town of Brant and was the Town of Brant Energy Chairman and I helped install their system on their highway department, which they got for free. I also was very instrumental in working when our Town was broke in 2015 to get the five systems that we have here on our municipal buildings. In fact, I have a question for any one of you; could you tell me what five installations there are, I don't think you...
**Director Smith:** Highway Department, Senior Center, Town Hall, South Creek Park and...you got me on the fifth one.

**Mr. Henry:** The Water Department. The reason I say that is that solar is so quiet and so unnoticeable. In this law that you got before you, you got terms like glare and glint; #1 there is no....

**Director:** May I stop you for a moment. Do you have the most recent...

**Mr. Henry:** Yes I do, the one that was downloaded today.

**Director:** Today online?

**Mr. Henry:** Yep. Okay it has glare and glint.

**Director:** Is that in the definitions?

**Mr. Henry:** Yes it is.

**Director:** Okay, that needs to be removed from definitions because it was removed from the rest of the draft.

**Mr. Henry:** Okay, the reason I say because the FAA even agrees that there is no glare or glint from solar panels.

**Director:** That was removed in the latest draft. There has been quite a bit of changes from the original draft.

**Mr. Henry:** Actually Bill, I got to commend you; since you took over you have made a lot of changes to it for the better. Also, could you tell me what size is considered a small scale solar system?

**Director:** The type 2 is not necessarily a size, it's the power generation equal to the utility billed the previous annual year plus 10% you can go...

**Mr. Henry:** Yes, under the present minimum guidelines. The reason I bring that up is because we actually had a company that may have moved out because of the solar moratorium we had here and it is one of the reasons New Era wasn't able to put a system on their building, where Goya could; Goya is still here. I mean that could have been a contributing factor. I'm not saying that's the only...

**Chair:** We actually have never been informed that that was a factor in their moving.

**Mr. Henry:** Well if you look here at the moratorium, it clearly states that you couldn't put anything on a commercial building.

**Chair:** And you know that we have no moratorium right now.

**Mr. Henry:** No, it ended in June of last year and nobody informed the commercial businesses in our Town that it did end. Okay, what else I would like to bring up is net metering is still in effect until 2020, so under that type 2, residential systems should be made aware of that. Another thing, why do we have to have 15-acres? The reason I ask you this is me and my wife just took a 7000 mile trip around

the country and one of the things that we noticed (we stopped at many solar farms) was farmers using solar energy to run their equipment, to run their pumps, I mean we saw whole orchards instead of tractors running the irrigation pumps there was actually a solar farm doing that. They also co-exist with the farming community as far as cows and that. We actually have pictures where cows are grazing underneath these solar farms.

**Director:** The 15-acres for a type 1 would be solely for the purpose of...

**Mr. Henry:** Yes, we found that in parts of the country our farmers are struggling. They are losing the opportunity to have 5 or 10 acres that they choose to have for a solar farm where they could lease it and have a second source of income, much like these cell towers and everything else.

**Director:** Also Bill, as know, the Planning Board does not make the final decision on this, it goes to a public hearing on July 17th.

**Mr. Henry:** I was the Chairman for one year of the Climate Smart Committee and the person that replaced me was in favor of solar opt-out. That means the residents in this Town can collect property taxes on something that is going to be helping our community; you can't tax solar, it's been on the books since 1977; our Supervisor wanted to do so. Also, the orientation of any SPC's shall not be directed to or adjacent to an adjoining residential dwelling. Why is that?

**Director:** So, I can speak to that a little bit. When I first looked at the Code there was no ground-mounted or freestanding solar installations allowed in any R-1 or R-2 District. I found that to be restrictive and for anyone who couldn't have a roof-mounted, whereas they didn't have a roof that would work well for solar. The concerns that I had heard was if we allow ground-mounted in somebody's backyard in R-1 or R-2 District they may just point it at the neighbor's house. So, what I did was I changed that so now a ground-mounted or freestanding solar installation is allowed in an R-1 or R-2 District and it is treated as an accessory structure within the same design criteria, setback criteria, height restrictions and things like that as is any accessory structure; a shed for example. So that is a big change to the previous code and it opens it up considerably for folks where a roof-mounted installation wouldn't work. One of the things, and as you know with Code and things like this is compromise, and knowing that there are folks, like yourself who are very pro-solar and those that have hesitations, that sort of balance then, when you open it up to something like that says "listen, you can do that, but you can't point it right at the neighbor's window."

**Mr. Henry:** Well, a simple fact of the matter is the person across the street could be putting it on their roof and it's pointed at my house. What a lot of people don't realize is, I've been part of a study in regards to ground-mounted versus roof-mounted and you actually get 25% more power out of the ground-mounted system because you can change the angle of the solar cells, not track so much, just change the angle themselves and you'll get 25% more power which will reduce the size of the system that you need for the house.

**Director:** The intent of that is just to avoid any potential nuisances. I understand your point about glint and glare, but the idea was that there was a concern there and the Code addresses that. All of these then would be reviewed, permit required, reviewed by Code Enforcement as well too. If it's partially pointed slightly at a neighbor's yard that isn't so much the issue as if it's pointing directly at a neighbor's house. Again, that was a big change that was not in there before.

**Mr. Henry:** Now we are on to energy generation restrictions in which you are talking about the size of the systems we can have as far as farms. We are a growing community, we want to grow, we want to bring businesses here. For us to restrict watt is a big issue, but powers another great big issue because in 2015 we were considered a low community which means we are so far away from the power we were actually paying higher rates than the rest of Erie County because of our distance from Niagara Falls and the other. Because of the moratorium this changed slightly, because now we are buying renewable energy from Chautauqua County, we're buying it from Hamburg, we're buying it from Lackawanna, I mean that is sad, our landowners lost out because of this moratorium, they lost out on hundreds of thousands of dollars. We lost out on payment in lieu of taxes revenue because of that moratorium. We need to allow a solar farm to come here, that will increase...it says here "capacity of

G:\PLANNING\PLANNING BOARD\Minutes\2019\Approved\180828 Suscliff, KPM, Alliance, Zoning Amends.docx

the current infrastructure". What if we increase the infrastructure, that means we can bring more businesses here. What is the harm in doing that? You'd just have a plan where you could bring in buildings here. We need to bring more power to our Town and that is the way we can do it. We can do it by allowing a solar farm. Let's talk about the environmental impact; the system right out here has the equivalent of, since it's been installed, 18 to 19,000 trees as far as a $CO_2$ offset. That means over 50,000 trees have been planted in our Town since 2015 in the equivalent. I don't mean to...I know we all want to go home and enjoy the rest of our night.

**Chair:** We were asking for 3-minutes. All of your comments are going to the Town Board and you can come to the Town Board Public Hearing on the 17th...

**Mr. Henry:** Yes, I will be there.

**Chair:** They will get our minutes with your comments as well.

**Mr. Henry:** Agricultural resources; you can't put a solar farm in agricultural district, why? Why shouldn't we let our farmers...

**B. Bergum:** Can I just...I just literally sat through two hours of an online thing that we are required to take and I chose this one. The population is growing and farmland is decreasing. Prime farmland is decreasing very well and from what they are saying, if you take this prime property, you'll never get it back and food is more important than energy to live. From what I saw in this two-hours of training, there is a way that it works, but you have to be smart about it, right, just like anything else. So if you just let anybody come in and do what they want to farmland and don't put any restrictions on it, it's gone. The way they are saying the population is growing in an exponential amount and food is going to be limited, growing sites are very limited, and we are one of the best agriculture areas in the state.

**Mr. Henry:** Yes, we are, but you have a farmer that can't afford to keep his property because he has no revenue that's a problem.

**B. Bergum:** The farmers we've dealt with, they don't want the solar. I hate to say it, but we tried to give them a way out but they wanted to keep it agricultural. I'm just saying the agricultural people we talked to wanted agriculture. We tried to make it Light Industrial and they argued with us, so I'm just giving you that point of view.

**Mr. Henry:** Okay, the final thing is, as far as the fees for solar farm, we've already negotiated as a resolution at the Town Board, nowhere in these fees is the payment in lieu of taxes even mentioned. Was that part of the...

**Director:** Yes, that was actually added, it does call out the payment in lieu of taxes will be required.

**Mr. Henry:** Where?

**Director:** Let me pull it up, I don't quite have it memorized yet, but I can point you to it. Here it is, page 15, section I, Fees, #4; pursuant to subdivision 9 of the real property tax...

**Mr. Henry:** Section I?

**Director:** Section I, under Fees on page 15; pursuant to subdivision 9 of the real property tax law a Solar Voltaic System owner shall be required to enter into a payment in lieu of taxes agreement with the Town.

**Mr. Henry:** There is nothing here and this was printed out today, a couple of hours ago.

**Director:** How many pages do you have there?

**Mr. Henry:** I've got sixteen.

**Director:** Interesting, this is the same one that I posted online...here, take my copy. There is also some more copies down in front here if you want to take some.

**Mr. Henry:** What I'm trying to say is as a community we need to, for future generations, we need to bring renewable energy here and we need to do it without a bunch of restrictions. When I put my system in, there was no hundred dollar permit and the fees also for a homeowner, they have to pay an electrical fee for an inspection which could cost them a couple hundred dollars. Tonawanda and Amherst and everywhere else, have waived their fees. I think it's time that we do stuff like that.

**Chair:** Thank you. We will send all your comments to the Town Board. Is there anyone else from the public that would like to speak on the Solar Law? Please make sure you give us your name, address and spell your last name.

**Mike Dolinar, 1424 Eden-Evans Center Rd.:** Yes, I want solar. First question, I don't have the new draft.

**Director:** You can take a copy from the table and also it is online.

**Mr. Dolinar:** I didn't see it. Any further change on Eden-Evans Center Road? The old draft said not on Route 5, not on Route 20, Eden-Evans Center; is that still there?

**Director:** I can only speak for the two-months that I've been here, but the draft that was put before me does say Eden-Evans Center Road between Routes 5 & 20 and that comes directly from the Comprehensive Plan.

**Mr. Dolinar:** So that is still there?

**Director:** Yes, I believe it is on page 49 of the Comprehensive Plan, but I would have to double-check that. It is a section on Solar Energy Systems and that area is called out specifically because of some of the concerns of the property owners wanting to maintain the agricultural character of the area and maintain the Light Industrial zoned land on the southern portion of the street for Light Industrial uses. And for future land use in the Comprehensive Plan those current parcels zoned Light Industrial are called out as Agri-Industrial. So things like food processing plants and things like that, the idea is to maintain the farmland and open space through there and then go with a combination of agricultural/industrial related uses.

**Mr. Dolinar:** Well, bottom line is I want to put a solar farm in, you may have heard. Omni Navitas is the company that wants to do it and then we run into this roadblock where you can't build on this street. I've got Industrial behind me, Industrial across the street, cell tower next door. I'm not a farm, Kwilos does hay it and he's recommended with you that would be a good spot to put a solar farm. **Director:** Joe Kwilos, Jr.?

**Mr. Dolinar:** Yes, and senior.

**Director:** Both are on the Agriculture Committee, which have provided a letter of support. **Mr. Dolinar:** Yes, and he's recommending, not that he has any pull, but I've talked to him and he's said they'd like to see it. We are not prime farmland, I am not a farm, it's my own personal property, it cannot be seen by anybody as it's over the ridge. So my question is, they put this can't build on Eden-Evans Center Road, what am I going to do?

**Director:** Jeneen, is that in an Erie County Agricultural District?

**Jeneen Hill, Code Enforcement Officer:** He is in the dark green, which is the Agriculture & Open Space District, so he could be. He does have an agricultural exemption on the property at the moment, but I'm not sure if it is in the Erie County Agricultural District.

**Chair:** Are you taking the Ag District tax break on your property?

**Mr. Dolinar:** I believe we do.

**Director:** So you are currently zoned Ag and Open Space and in the County Ag District.

**Mr. Dolinar:** I believe so.

**Chair:** So his issues are beyond the Town.

**Director:** So it's beyond just the road that you are on.

**Mr. Henry:** So if he removes the Ag exemption...*(called out from the audience...in audible).*
**Chair:** Let's hear Mr. Dolinar.

**Mr. Dolinar:** I have no problem removing it, the Ag Industrial or whatever thats called. That's not my issue; I mean it is but.

**Chair:** We will further your comments onto the Town Board and you are more than welcome to come to the Public Hearing on the 17th at the Town Board and voice your comments on the law as well. **Mr. Dolinar:** But this draft is not going to change?

**Director:** Well it is still a draft, but it still has to go before the Town Board.

**J. Pinter:** We will either recommend or not recommend this to the Town Board, as they have final say.

**Chair:** Yes, we do not have the final say on passing laws.

**Mr. Dolinar:** I understand that, but what do I do to proceed?

**J. McEvoy:** Go to the Town Board meeting.

**Director:** Yes, that is the next step. They will conduct the Public Hearing.

**Mr. Dolinar:** Is there going to be a Public Hearing after that or is that the final?

**Director:** That will be the Public Hearing.

**Mr. Dolinar:** So it would be a little late to recommend anything.

**Chair:** The Town Board can make changes to the proposed law.

**Mr. Dolinar:** They can make changes?

**J. McEvoy:** The Town Board most always makes changes to everything.

**Chair:** They sometimes don't take our recommendations.

**J. McEvoy:** It's not 100%.

**Mr. Dolinar:** Like I said, I have a guy that hays my field, he doesn't rent it, I just give it to him; Kwilos is the name, everybody knows who that is.

**B. Bergum:** He's my brother-in-law.

**Mr. Dolinar:** And he has recommended it and said why not. All I can say is, you're saying farmlands, and here is a farmer, and it's not a good farm, it's not good soil.

**Chair:** Thank you for your comments and we will forward them onto the Town Board. I hate to say you're over your 3-minutes, but I think that we don't exactly have a crowd here to enforce it, but we will send it on.

**Mr. Dolinar:** Can I just say one more thing? I have been fighting with the Town Board in the past. They wanted to put a garbage transfer station down the road where the airport was and we fought that, yes we did. Yes, we didn't want Industrial there for those reasons and they kept explaining to us that this is the entrance to our Town from the Thruway and Eden-Evans Center Road; they wanted business, they want it to look good because that's our main entrance. If you put solar, it puts the Town on the map, just like Grand Island. People from all over the Country know where Grand Island is because of solar. Why can't the Town of Evans get on the map; here's the opportunity, that's all I can say, consider that. They wanted to industrialize this street anyway and we're giving them the opportunity. Yes, this company is paying in lieu of taxes; it's not free taxes, so the Town is making money. Everybody benefits, I benefit too and so do all you people benefit also. I think that's what this Town needs. Solar doesn't tax your sewer system, it doesn't tax your water system, we wouldn't need a water tower if we didn't have the sewer problems. Solar does none of that, it's green energy, it gives you stuff and that's what I think everybody has got to think about.

**Chair:** Thank you Mr. Dolinar, we will pass your comments on.

**Mr. Dolinar:** Thank you.

**Chair:** Is there anyone else who would like to speak on the Solar draft? *No response.* There being no further comments, I will close the floor and bring it back to the Planning Board for further questions/comments.

**J. Pinter:** I would just like to say that I think (a) especially, and the Board has done a good job putting together this new zoning that we are proposing. Although it may not be perfect, I think we need it as a Town now. The moratorium is over and as we've discussed in our meetings, I do think it is limiting to some farmers, and I think it should be a priority moving forward that we address solar and see if there is any way we can make improvements, especially for the runoffs. From the studies we've done and the meetings we've had, the farmers were against it for the most part. We had tonight a farmer, and somebody who is working with him

**Chair:** Well, he's not a farmer, but a land owner in that area.

**J. Pinter:** And similar people in that area who have expressed their concerns that I was worried about initially as well. So I guess what I'm saying is we need to get this on the books. We need to move forward with Solar, but I think in the future we need to encourage more Solar in this Town in my

estimation. However we do it, we need to address more Solar in this Town and I think it should be a high priority moving forward.

**Chair:** Anyone else? There being no further questions from the Board may I please have a motion.

**M. Connors:** I will make the motion. I would like to make a motion to recommend to the Evans Town Board the approval of the following zoning amendment:

• The addition of Article XIII. Solar Energy Systems Law to Section §200: Zoning of the Town of Evans Code

For the following reasons:

1. The action is consistent with the Town of Evans Comprehensive Plan.
2. The development and utilization of solar energy systems in the Town will provide a benefit to the local community and surrounding area.
3. The action is not expected to result in any significant adverse impacts.

I would also like to recommend that additional consideration be given to the comments provided by the Erie County Department of Environment and Planning in their 239M review.

**J. McEvoy:** Second.

*Vote: All in favor. Motion carried.*

**Chair:** Next Steps: This recommendation will now be passed on to the Town Board.

## The Second Zoning Amendment for consideration is:

### PROPOSED LAW NO. 6 OF 2019 – AOS ACCESSORY STRUCTURES AND NO UNREASONABLE REGULATIONS

The proposed law will amend Subsection §200-8.1. of the Town of Evans Code to allow for an increase in size of accessory structures, and to ensure that no unreasonable regulations are imposed on the farming community.

The purpose of AOS proposed changes are to maintain the rural tradition and character of the Town and stabilize land values through the preservation of rural and agricultural uses and to provide protection from uses adverse to the continuation of agricultural uses. In accordance with the Town of Evans Comprehensive Plan, to preserve agricultural uses, by allowing for less restriction and larger agricultural buildings to be built to suit the needs of existing and start up farms in the area. The intent is to maintain the integrity of agricultural uses, promote agriculture as a component of the local economy, help farmers continue viable business activities under current economic conditions, and preserve open space and the rural character of the Town.

A draft of the amendment was also reviewed at Planning Board Work Sessions held on June 12th of 2019.

### INTERDEPARTMENTAL REVIEWS:

**Planning Director, William Smith:** No further comment

**Code Enforcement Officer, Jeneen Hill:** No further comment

### OUTSIDE AGENCY REVIEWS:

**Erie County Department of Environment and Planning:** The 239M Review was sent to the County on June 21, 2019 and returned on June 28, 2019; they offered no recommendation having determined the proposed action to be of local concern.

ssantstitch

.

.

.

.

.

.

.

.

.

.

.

.

.

.

.

.

.

.

.

.

**Michael Argentieri:** So, this is about the updated Code?

**Chair:** This is about the proposed law to go to the Town Board to allow for Dog Day Care Services in the General Business District.

**Mr. Argentieri:** Okay.

**Chair:** You were at our meetings so you have the proposed law.

**Mr. Argentieri:** Is this regarding the...

**Director:** There is a copy there on the table.

**Chair:** There is a copy here and you can read it online.

**Director:** It is the same one we provided you before.

**Chair:** If you want to review it and take some time with it, we will not be passing the law tonight, we will be making a recommendation to the Town Board and they have the Public Hearing set for July 17th and they will take your comments; you can also comment tonight and we will pass your comments on.

**Mr. Argentieri:** I wish I would have known, I could have had this read and I would have been prepared. I do have one comment though. I talked with the Code Enforcement Officers in West Seneca and Hamburg and neither the Town of Hamburg or Town of West Seneca have any issues with boarding or with the amount of dogs you have. They said as long as it's commercial you're good to go. So, I'm not sure if it's here or not, but the issues about how many dogs you can have and whether or not you can do overnight boarding I think should be added or allowed or I'm not even sure.

**Director:** One dog per 100-square feet of the socialization, exercising; any of the indoor areas. You may have one dog per 100-square feet.

**Chair:** And because this is in the business district, it is not a kennel. A kennel boards overnight a dog day care provides day care.

**Mr. Argentieri:** Can I ask you where you are getting that from? With all do respect.

**Director:** I can tell you that the NYS Department of State recommended a model code to us from the Town of Amherst. That is the one that they are saying is a model code that other municipalities should follow. So, that is what we used as our starting point for this. It's not exact, but it's a starting point.

**Mr. Argentieri:** Okay, so that comes from Albany? So they are looking at Brooklyn and they are looking at Derby as they are the same.

**J. McEvoy:** Actually they recommended the Amherst ordinance, they are not taking it out of Brooklyn.

**Director:** Our meeting with them was in Orchard Park.

**Mr. Argentieri:** I'm just not understanding. I mean....

**Chair:** Because you are not a kennel.

**Mr. Argentieri:** Yeah, okay. That word kennel I've been hearing that for 6-months. I'm not a kennel but kennels also do all sorts of things. Doggy Day Cares do all sorts of services.

**Chair:** Day Care.

**Mr. Argentieri:** Not just Day Care.

**Chair:** I think it's the same if you look at child Day Care; people drop off their child and they pick-up their child the same day. The child does not board, it's not a boarding facility. We have boarding facilities in Town and they are not on Route 5 in the commercial district. You were in our meetings, we had discussed how many hours. You never mentioned you wanted 24-hour Doggy Day Care and you wanted boarding; boarding is 24-hours. Day Care is different from boarding, I don't know why it is hard for you to understand.

**Mr. Argentieri:** It's not hard for me to understand Day Care and boarding are two different things, but why can't one business do Day Care and boarding? It's not a kennel. I don't own the dogs, I'm not selling the dogs, I'm not breeding dogs, that's the definition of a kennel. Day Cares, as I just said in West Seneca and Hamburg, are allowed to do boarding, they are allowed to do grooming, they are allowed to do whatever they want to do.

**Chair:** Well you won't be allowed to do whatever you want to do under this draft law, but if you want to go to the Town Board and express those opinions, you are very welcome to and our minutes will be

going onto the Town Board from tonight. You can see from the vote if you have any support on the Board to do what kennels do and have 24-hour boarding.

**Mr. Argentieri:** I'm not asking to do what kennels do. I never proposed to be a kennel. I never proposed that.

**Chair:** The definitions are different for Boarding and for Day Care. And the definitions are in that law. So, I don't want to put down your comments, I think your comments should go to the Town Board and they can review them. You are welcome to go to the Town Board meeting on July 17th and...

**Mr. Argentieri:** My question would be then if once this goes to the Town Board and let's say the Town Board decides, "yeah, he's right and we should expand this", does this have to come back to the Planning Board?

**Chair:** No.

**Mr. Argentieri:** Okay.

**J. McEvoy:** They can make the changes at the Town Board level, if they so choose.

**Mr. Argentieri:** Okay, I'm not trying to be argumentative, but I'm trying to operate a business profitably and with the limitations and the amount of dogs boarding...if you go online and look up Doggy Day Care, not all of them, but I'd say 70% have boarding as well. Day Care, boarding, grooming, it's like all-inclusive services. I'm actually looking at other buildings too because I'm thinking maybe my buildings too small. But, I want to look down the road and that's why I'm asking to allow the boarding as well.

**Director:** If you're going to look at another building that wasn't zoned General Business where you're not in a dense commercial corridor, you could do that. It's just your in a dense commercial corridor with General Business; that's where the Day Care versus kenneling overnight really starts to come in play.

**Mr. Argentieri:** The hours of operation are from 6am to midnight, from what I was told, so midnight to six, I'm not understanding.

**Director:** Because people have to pick-up their dogs on their way home if they are working second shift. We are doing that to help accommodate the business.

**J. Pinter:** May I just add that unfortunately when you wanted to open up this business there was nothing on our Town Code for or against it, you just couldn't put it where you wanted to put it. So, we as a Planning Board and as a Town, decided that we needed legislation on the books and unfortunately we couldn't just do it for your situation, we had to do it for everybody; for you and for the next person who wants to come in. So what we have done for our term Doggy Day Care is for Doggy Day Care on a Town-wide basis for whomever wants to come in, unfortunately we couldn't just shape it for your exact needs; we had to do it as a bigger spectrum to get it on the books to see what's allowed in this Town. So, there is definitely a bit of difference working from the get-go right from the beginning with kennels and boarding which are allowed in some parts of the Town but not on Route 5 in General Business. All that went into consideration with this and we worked a couple months now at least, and we did take other Day Care regulations from other Town's other than just Amherst.

**Jeneen Hill, Code Enforcement Officer:** Most of them are only allowed in Ag & Open Space, even in Hamburg; they are not allowed in General Business.

**J. Pinter:** So we did reach out to other Towns.

**Mr. Argentieri:** I talked to Hamburg. The Town or the Village?

**J. Hill:** The Town.

**Mr. Argentieri:** I went to the Town of Hamburg.

**J. Hill:** The Village Veterinarian is a secondary use, it's not a primary use. You have to look at that too.

**Mr. Argentieri:** I wasn't speaking of the Village Veterinarian, but I went to the talk to the Code people in Hamburg and they had two different business listings and one said you can open Doggy Day Care, I think it was C-1, where you can't have dogs outside.

**J. Hill:** Who did you speak to in Hamburg? What was the Inspector's name?

**Mr. Argentieri:** I don't remember the name and don't have that with me.

**Chair:** I don't want to call the 3-minute, but I have let you go for a long time. I think that I will close the floor to the public and if any other Planning Board members have anything they would like to add, if not, I will ask for a motion.

**Director:** I would just like to encourage Mike to attend the July 17th Town Board meeting where you can plead your case on that. Right now, we are going to be voting on this draft.

**J. McEvoy:** If you know any other people in Town who have aspirations of opening up a Dog Day Care, or they already have one, and they want to come, invite them to the meeting on the 17th.

**Mr. Argentieri:** I do appreciate the effort everybody is putting in on this, I mean I started this in December.

**Chair:** Thank you very much. If there is no other business to come before the Board I will ask for a motion.

**J. McEvoy:** I would like to make a motion to recommend to the Evans Town Board the approval of the following zoning amendment:

- Amend Subsection §200-21B of the Town of Evans Code to define permitted uses and provide design criteria for Dog Day Care Services within the General Business Zoning District (special use permit required).

For the following reasons:

       1. The action is consistent with the Town of Evans Comprehensive Plan.
       2. We believe this service will provide a benefit to the community.
       3. The action is not expected to result in any significant adverse impacts.

**A. Sellers:** Second.

*Vote: All in favor. Motion carried.*

**Chair:** Next Steps: We will pass on that motion to the Town Board. If there is no other business, I will ask for a motion to adjourn.

**J. McEvoy:** Motion to adjourn.
**J. Pinter:** Second

**Chair:** Thank you everyone for attending. Good night.

Respectfully submitted by:

*Debra L. Wilson*

Debra L. Wilson
Secretary

Approved: 08/28/19